# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    929-294-2545
DIRECT EMAIL  mmiller@kaplanhecker.com

October 1, 2021

**BY ECF**

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   *Re:*  *U.S. v. Bryan Cho*, 21 Cr. 040 (AMD) (E.D.N.Y.): **Sentencing Memorandum**

Dear Judge Donnelly:

  We represent Bryan Cho, who is scheduled to be sentenced by Your Honor on October 8, 2021, at 2:30 p.m. On June 4, 2021, pursuant to a plea agreement with the government, Mr. Cho pleaded guilty to aggravated identity theft and wire fraud, in violation of 18 U.S.C. §§ 1028A and 1343. Your Honor accepted the plea that day.

  The plea agreement includes a stipulated advisory sentencing range under the U.S. Sentencing Guidelines (the "Guidelines") of 51 to 57 months, which is also the Guidelines range calculated in the Presentence Investigation Report ("PSR"). Given the significant degree to which the Guidelines overstate the impact of Mr. Cho's non-violent offenses, the nearly nine months of pre-sentence detention that Mr. Cho has served at the Metropolitan Detention Center in exceedingly harsh conditions during the Covid-19 pandemic, the medical issues that Mr. Cho is facing, the strong support network of family and friends awaiting him after his release, and the improbability of recidivism—we submit that a sentence below the Guidelines range is appropriate and sufficient to meet all of the purposes of sentencing. For the reasons that follow, we respectfully submit that Mr. Cho should be sentenced to 30 months in custody.

## I. Background

### a. Mr. Cho's Childhood and Education

  Bryan was born in 1971 in Seoul, South Korea. His father, Hyungki Cho, owned a successful publishing company that specialized in educational books. His mother, JaeEun Cho, was a college professor and author of Christian books and poems. Mr. Cho's parents raised him

and his younger sister in an orthodox Christian household and sent Mr. Cho to all-boys schools and Christian camps, where corporal punishment was not uncommon and Mr. Cho and other children were beaten for disobedience. For an extended period of Mr. Cho's childhood, Mr. Cho lived with his sister and mother in Seoul while his father lived and worked far outside the city. PSR ¶¶ 40, 42.

Although they were a close family, Mr. Cho's parents were strict, and generally believed that children should be "seen and not heard." They prized both secular and religious education, pressuring their children to succeed academically and devote themselves to the Christian Church. Mr. Cho and his sister were required to attend church services twice a week—Wednesday prayer and all-day Sunday school—and Bible camp every summer until they were 17. *Id.* ¶ 42.

Much to his parents' severe disappointment and dismay, Mr. Cho failed to pass the entrance examination required for a four-year college education in South Korea, instead qualifying only for junior college. As a result of this failure, Mr. Cho's father cut him off financially, telling his son that he would not provide any further financial assistance until he proved to his parents he was sufficiently dedicated to his studies. *Id.* ¶ 64. This was a devastating blow to Mr. Cho, both psychologically and emotionally.

As a result of his academic failure and the resulting family discord, and motivated by a desire to complete college and demonstrate to his parents that he would amount to something, Mr. Cho struck out on his own, moved to the United States, and settled in the New York metropolitan area, in Jersey City, New Jersey. *Id.* ¶¶ 43-44. Mr. Cho was 20 years old, spoke very little English, and knew almost no one in this country. Cut off from his family, Mr. Cho was forced to build a new life, alone in a nation he had never even visited before.

Shortly after he arrived in New Jersey, Mr. Cho began taking community college classes at night and working odd jobs in retail and security to support himself. *Id.* ¶ 69. His goal was to pursue a career in finance. After two years of classes at local community colleges—Nyack College and Mercy College—Mr. Cho transferred to SUNY New Paltz, from which he graduated in May 1996. *Id.* ¶¶ 63-64. During his last semester at SUNY and for several months after graduating, Mr. Cho worked at IBM in the IBM cooperative education program. *Id.* ¶ 69.

 b. Mr. Cho's Personal and Family Life

In October 1998, while living in Seattle, Mr. Cho married his first wife, Kerry Byun. Mr. Cho and Ms. Byun were married for almost four years, during which time Mr. Cho worked for Bank of America and Solomon Smith Barney. After four years of marriage, Mr. Cho made the decision to return to the East Coast to pursue graduate school. Ms. Byun wanted to remain in Seattle to live near her family, and, as a result, the couple divorced amicably in 2002. *Id.* ¶ 45. Mr. Cho moved back to New Jersey and enrolled at Rutgers in a Master of Accountancy in Taxation program.

In April 2003, while pursuing his graduate studies at Rutgers, Mr. Cho became a naturalized U.S. citizen, and, proud of his adopted country, he renounced his South Korean citizenship. He has been a citizen of only the United States for the last 18 years. *Id.* ¶ 43. Mr.

Cho graduated from Rutgers with his taxation degree in May 2004 and began working for the IRS on the civil side as a Revenue Agent shortly thereafter. *Id.* ¶¶ 62, 69.

After completing his graduate studies and starting a career in the United States, thereby meeting his father's standard of demonstrating academic and professional worth, Mr. Cho was able to reconnect with his parents. As their oldest child, it was Mr. Cho's responsibility under Korean cultural norms to care for his parents as they aged. To facilitate that care and be closer to their son, Mr. Cho's mother and father became lawful permanent residents of the United States.

Mr. Cho married his wife Esther, a naturalized U.S. citizen, on New Year's Eve in 2006. *Id.* ¶ 46. Mr. Cho met his wife through a prayer group, and they connected over their common background as immigrants from South Korea and their shared devotion to Christianity. As Esther writes in her letter to the Court, she and Bryan "came to know and respect each other through our shared commitment to strengthening our faith. We studied Bible verses together, prayed, and attended church events. Bryan's maturity, trustworthiness, and devotion to his faith were evident to me early on, and it was for these reasons that I agreed to marry him." Exhibit A at 6.[1]

Bryan and Esther have two daughters, Ye.C. and Yu.C. now aged 14 and 11, who were both born and raised in the New York metropolitan area.[2] PSR ¶ 47. It is no exaggeration to say that Mr. Cho's wife and daughters are his entire life. As Ye.C. and Yu.C. wrote in the enclosed letters to the Court, Mr. Cho spent all of his non-work time with his family – helping with school work, providing emotional support, going on walks and runs, traveling near and far, cooking, and simply providing for his family's needs. As a father, Bryan is "always devoted to spending time with me and my sister and making his family happy," Ye.C. wrote. Exhibit A at 9. Ye.C. went on to detail what she loves most about her father. She wrote about how Bryan was "always there for me" to help with homework, always willing to go on roller coasters, eat meals together and help out in the kitchen, receive makeovers, and support her dreams. *Id.* at 9-11. Ye.C. wrote that when her dad gives her hugs, "it feels like a safe spot, a place where I can share all my secrets." *Id.* at 10. To Ye.C., Bryan is a "life-changing, warm, super amazing, beautiful, kind, and sacrificing person. I'm so grateful to have him in my life and I miss him incredibly." *Id.*

Yu.C. similarly described Bryan as always making every effort to "spend quality time with me" and "putting his children first at all times." *Id.* at 14. Yu.C. is looking forward to Bryan's release from custody so she can "share more stories and advice with him during sleepless nights, go on more runs together . . . , and learn more from him to be an even more strong person in this scary world." *Id.*

Bryan and Esther moved from a suburb in New Jersey to Manhattan in September 2015 in part so they could provide their daughters with the best possible education. Bryan and his family moved to 84th street in Yorkville in 2018 so Ye.C. and Yu.C. could attend school in that

---

[1]     Letters to the Court from Mr. Cho and his family, friends, and former colleagues are attached as Exhibit A, with Mr. Cho's letter first, followed by the letters of supporters in alphabetical order by last name.

[2]     The full names of Ye.C. and Yu.C. have been replaced by initials, as dictated by Rule 49.1(a) of the Federal Rules of Criminal Procedure.

neighborhood. Reflecting their dedication to education, Bryan's and Esther's parents have jointly financed the girls' tuition since they enrolled in private school there.

Motivated by a desire to spend more time with his parents (who are aging, suffer from serious medical conditions, and have not lived with Mr. Cho in over 30 years) and to enable his daughters to see their grandparents more often, Mr. Cho worked with his family to fund the purchase of a co-op apartment in Manhattan in 2019. The co-op enabled Bryan and Esther's daughters to live closer to school, and its three bedrooms also provided enough room for Bryan's parents, sister (a single mother), and niece to live with them, with the intent to bring the extended family closer together. The arrangement would also have permitted Bryan to care for his aging parents, as was expected of him by Korean tradition. Bryan's parents are elderly, and his father has high blood pressure and a heart condition, and Bryan knew that he would need more assistance as he got older. Unfortunately, Mr. Cho's parents were unable to re-locate from South Korea to New York due to the Covid-19 pandemic and health setbacks, including Bryan's mother suffering multiple cardiac arrests earlier this year. As a result, Bryan has not seen them in nearly three years. PSR ¶ 49; Exhibit A at 5 (letter from Hyungki Cho).

Bryan also has deep ties to the Christian and Korean-American communities. Among the letters included in this submission are letters from Tae Hyun Kim, a pastor in South Korea who has known Bryan since he started attending Sunday school at his church 40 years ago, and Joseph and Joyce Park, Christian missionaries working in Papua New Guinea. Exhibit A at 16-17, 19. As noted in the Parks' letter, Bryan has supported the Parks' work since 2015. *Id.* at 19. Bryan also was active in several community groups, including the Society of Asian Federal Officers.

As Bryan provided his family's only source of income, since his arrest Esther and their daughters have had to rely on support from their extended family to get by.

    c. Mr. Cho's IRS-CI Career

In 2008, after four years as a Revenue Agent on the civil side of the IRS, Mr. Cho moved into criminal enforcement, becoming a Special Agent with IRS–Criminal Investigation ("IRS-CI"), a position he held for more than 12 years. Mr. Cho was hired specifically for his dual language fluency in English and Korean and familiarity with South Korea. These qualities were an asset to IRS-CI during a time when the U.S. government was forging a relationship with South Korean law enforcement agencies and working bilaterally on investigations that touched both countries. As a result, Mr. Cho was frequently assigned to cases and projects that made use of his language skills and cultural familiarity with South Korea and was regularly commended in his IRS performance reviews for working with South Korean tax officials to develop joint cases between the two countries. PSR ¶ 68.

During his 12-year career with IRS-CI, Mr. Cho played an important role in numerous joint U.S.-South Korean tax investigations. Mr. Cho was involved in negotiations with South Korean counterparts on establishing the joint South Korea-U.S. Simultaneous Criminal Investigation Program, which facilitates information sharing between the two countries' tax authorities. As part of those negotiations and to further develop the important ties between the IRS and the South Korean tax authority, Mr. Cho traveled to South Korea with then-current heads of IRS-CI on multiple occasions to meet with South Korean law enforcement and intelligence officials. *Id.* As

recorded in his IRS performance reviews, Mr. Cho performed at a high level throughout his career, regularly receiving commendations for performance exceeding his supervisors' expectations. *See, e.g.,* Exhibits B, C (representative and recent examples of performance evaluations).

In written feedback and performance reviews, Mr. Cho's supervisors have noted that he took on a "greater leadership role" within his IRS-CI group following the departure of more senior special agents, and "readily [made] himself available to be of assistance to other group members. He does so in a pleasant and professional manner." Exhibit B at 3. Mr. Cho was further described as working well with IRS upper management, foreign contacts, and DOJ attorneys to handle his complex caseload. *Id.* at 3-4. In a 2018 email included in one of the government's productions in this case, former acting United States Attorney for the Southern District of New York Joon Kim described Bryan as a "terrific IRS agent," citing Mr. Cho's past work with the SDNY U.S. Attorney's Office. Exhibit D at 1.

Mr. Cho's career as a high-performing IRS agent is reflected in the enclosed letters of support from former colleagues, including his former supervisor William Cheung and other former and current IRS agents. *See* Exhibit A at 3-4, 18, 20. In addition to handling his duties as an IRS agent, Mr. Cho worked to promote compliance with the U.S. tax code in the Korean-American community. Mr. Cho coordinated a tax seminar for the Korean Chamber of America, the Korean-American Association of Greater New York, and the Consulate General of South Korea in New York City as part of an effort by the IRS to educate the public about U.S. tax law and enforcement and develop connections in that community to facilitate tax investigations and increase tax compliance.

In November 2011, Bryan was involved in a major car accident while on the job as an IRS agent. He suffered serious injuries to his neck and back, which required extensive treatment and physical therapy and necessitated that he take six months of workers' compensation leave. PSR ¶ 57. Although his doctor encouraged him not to return to work because of the severity of his injuries, Bryan was persuaded to come back to the IRS and resume his work as a criminal investigative agent because of his unique expertise on joint U.S.-South Korean investigations. Mr. Cho was promoted to GS-13 in early 2014, less than two years after returning to work after his car accident. *See* Exhibit E at 3.

    d. Nature and Circumstances of the Offense

       i. The Documents and Background Investigation

While serving as an IRS-CI agent, Mr. Cho considered using an individual as a confidential source in international tax investigations. The individual told Mr. Cho that he had access to networks in Asia that could obtain passports from various countries under false identities, and that he could use that access as part of an investigation into tax evasion by cryptocurrency owners who were using fraudulently obtained foreign identification documents to evade U.S. taxes. To prove to Mr. Cho that he had the ability to obtain such passports, the individual fraudulently obtained a passport from the Republic of Guinea-Bissau and other identification documents (the "Documents") that contained photographs of Mr. Cho and the name of the individual identified as "John Doe" in the Indictment, and he gave the Documents to Mr. Cho. As illustrated by the records provided by the government, Mr. Cho never used the Documents for any international travel;

however, he did use one of the Documents to incorporate a business in Asia that Bryan thought could provide an organizational mechanism to manage his extended family's assets overseas. This idea was not acted upon, except that the name of the company Mr. Cho incorporated was used in connection with two bank accounts. For a period of time, the company's name appeared on the address line for an account in Singapore belonging to Mr. Cho's sister-in-law. And the company was listed as an account holder for another account in Hong Kong. There is no indication that any funds were transferred into the Hong Kong account beyond a nominal deposit or that the bank account or the company was otherwise used.

On September 25, 2018, Mr. Cho digitally signed and submitted a Standard Form 85P ("SF85P") using the federal e-QIP system, as part of his periodic background check for his continued employment with the IRS. In response to a question that asked whether he had ever used any other names besides Bryan Cho, Mr. Cho listed only his Korean birth name, Yong Hee Cho. He did not list the name of the individual identified as "John Doe" in the Indictment. PSR ¶ 8.

ii. The Bail Proceedings

Mr. Cho was indicted on January 22, 2021, and arrested four days later, on January 26. In the days immediately following his arrest, owing to quarantine procedures at the Metropolitan Detention Center – Brooklyn (the "MDC"), Mr. Cho had very limited ability to speak to counsel and was not able to establish regular contact with his attorneys until several weeks into his pretrial detention. Indeed, Mr. Cho was unable even to dial-in and attend remotely either of the arguments for his release on bail. *See* ECF No. 24 at 2; ECF No. 32 at 2.

At his presentment and in subsequent proceedings, the government moved for detention on the ground that Mr. Cho posed a risk of flight. In making this argument, the government relied on Mr. Cho's contact with two citizenship-by-investment companies in late December 2020, while he was aware of the government's months' long investigation into him, alleging that this contact suggested that he was preparing to leave the country and re-locate abroad. In opposing this argument and requesting pre-trial release, Mr. Cho, through counsel, pointed out that: Mr. Cho's communications with the companies were limited; the communications stopped three weeks before he was arrested; and there was nothing illegal about someone who had not been charged and was not under any form of court-ordered supervision to consider obtaining citizenship elsewhere. ECF No. 16 at 7. Mr. Cho also noted (through counsel) that a representative of Astons had informed his counsel in writing that Mr. Cho was "not our client," did not pay any fees, and did not receive any services. *Id.*; *see also* Exhibit F at 1-3 (email exchange with representative of Astons).

The government subsequently obtained documents from Astons establishing that one aspect of Mr. Cho's argument (and of Astons' own email to counsel) was not complete and accurate. While it is true that Mr. Cho's communications with the companies appear to have stopped weeks before he was arrested, notwithstanding the Astons employee's representation to defense counsel that Mr. Cho did not pay any fees and was not a client, *see* Exhibit F at 1, Mr. Cho had in fact attempted to make a $20,000 initial payment as part of the citizenship-by-investment application process, and had provided Astons with copies of passports and other immigration-related documents. The payment apparently did not go through, and Mr. Cho abandoned the process shortly thereafter. *See id.* at 2. While representatives of the company continued to reach

out to Mr. Cho into early January to encourage him to continue the process and re-attempt payment, Mr. Cho stopped responding to their entreaties on December 31, 2020.

     e.  Mr. Cho's Arrest and Detention at the MDC

Since his arrest almost nine months ago, Mr. Cho has been detained at the MDC. At the MDC during the Covid-19 pandemic, Mr. Cho has been repeatedly subject to quarantine procedures that have left him confined to his cell for as much as 23 hours a day. Mr. Cho has also been attacked physically and verbally by other detainees because of his race and his status as a former law enforcement officer. Mr. Cho's detention at the MDC has adversely impacted both his physical and mental health in a manner that has rendered his period of detention extraordinarily punitive and onerous.

Mr. Cho suffers from asthma, high cholesterol, and type 2 diabetes, with which he was diagnosed approximately a decade ago and was able to manage effectively with oral medication and daily exercise prior to his arrest earlier this year. PSR, ¶¶ 53-55. Since his confinement, Mr. Cho has experienced worsening blood sugar levels, causing medical professionals at the MDC to prescribe twice daily insulin injections—representing a notable downgrade in his condition as he had never needed insulin injections before his incarceration.[3] PSR ¶¶ 54-55. In addition to his worsening diabetes, Mr. Cho was recently prescribed Lisinopril by a doctor at the MDC to reduce his risk of developing cardiovascular disease as a result of his diabetes. Mr. Cho had never previously been prescribed Lisinopril.

Mr. Cho's mental health has also deteriorated since his arrest. PSR ¶ 60. At the MDC, Mr. Cho experienced many weeks of Covid-19 quarantine, resulting in severe restrictions in his ability to leave his cell and communicate with the outside world. During his initial detention between January and March, Mr. Cho was only permitted to spend 30 minutes outside of his cell every other day. That restriction has since loosened, in part due to Mr. Cho's work as a kitchen orderly in a unit that houses newly admitted detainees (many of whom are unvaccinated). But extended lockdowns at the MDC have recently become commonplace occurrences, owing to the increased population of inmates due to the closure of the Metropolitan Correctional Center (the "MCC").[4] For the duration of his detention, Mr. Cho has had only limited interaction with his family due to intense restrictions on social visits, which are limited to one hour-long visit per month. His family relationships have suffered, with significant impact on his emotional well-being. Mr. Cho has not seen the most important people in his life—his daughters—since his arrest in January. For an extended period of Mr. Cho's detention, no family visitation was allowed, and until recently, only adults were permitted to visit. While Mr. Cho was finally recently able to

---

[3]    *See* Camille Noe Pagán, *Pills vs. Insulin for Diabetes Treatment*, WebMD (May 8, 2020), https://www.webmd.com/diabetes/diabetes-insulin-pills (noting that doctors recommend insulin injections where "pills aren't enough to get your blood sugar under control").

[4]    Noah Goldberg, *Brooklyn federal jailers work 16-hour shifts amid prisoner influx as government shuts Jeffrey Epstein suicide lockup in Manhattan*, N.Y. Daily News (Sept. 3, 2021), https://www.nydailynews.com/new-york/ny-nyc-elected-officials-mdc-mcc-transfers-closing-jeffrey-epstein-20210903-sy4slespabfyjjn6cnnhb3ralm-story.html.

schedule two visits to attempt to see his daughters at the MDC, both visits were cancelled due to lockdowns.

Mr. Cho's time at the MDC has also taken a toll on the health of his mother, who has experienced multiple cardiac episodes and hospital stays since learning that her son was arrested and incarcerated. *See* Exhibit A at 5, 16. Because of his limited contact outside of the MDC, he has been unable to speak with his mother or keep current on her health condition, which has been an additional source of stress and anguish for Mr. Cho.

Further, Mr. Cho has faced repeated threats directed at him both because of his race and because he is a former law enforcement officer. The MDC has not been immune to the distressing increase in the targeting of Asian Americans during the Covid-19 period, and Mr. Cho has experienced many racially motivated verbal attacks. In addition, on one occasion in early April 2021, Mr. Cho was physically assaulted by another inmate who targeted Mr. Cho because Mr. Cho is a former federal law enforcement officer.[5] The pressures of living at the MDC during Covid and experiencing these emotional and physical attacks have led Mr. Cho to see a psychologist at the MDC every other week for the first time in his life.

      f.   Mr. Cho's Acceptance of Responsibility

On June 4, 2021, pursuant to a plea agreement with the government entered at an early stage of the case, Mr. Cho pleaded guilty before Your Honor to aggravated identity theft and wire fraud. On June 8, 2021, Mr. Cho paid the stipulated Forfeiture Money Judgment of $394,374.63 early, as it was not due until 30 days prior to Mr. Cho's sentencing.



---

[5]     We have repeatedly requested that the MDC and the government provide incident reports relating to this attack, but our requests have been denied. For example, shortly after we found out about the incident, we requested incident records from counsel for the MDC, who responded that she "cannot provide [us] with that information." Exhibit G at 1.

# KAPLAN HECKER & FINK LLP



## II.  A 30-month Sentence Appropriately Reflects Mr. Cho's Culpability and Is Sufficient to Deter Future Criminal Activity

We respectfully submit that the sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence for Mr. Cho of 30 months' incarceration.

As the Court is well aware, the Sentencing Guidelines are "*not mandatory* on sentencing courts" and are "also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original).  In imposing a sentence, courts are required to consider the factors set forth in 18 U.S.C. § 3553(a) to create an "individualized assessment" based on a defendant's particular circumstances. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

A Court must impose a sentence below the range recommended by the Guidelines if such a sentence would satisfy the purposes of § 3553(a). *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).  It is the Court's responsibility to impose a "sentence sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing.  18 U.S.C. § 3553(a).

Given the duration and nature of Mr. Cho's detention at the MDC, Mr. Cho's personal history, and the circumstances of the offenses of conviction, a below-Guidelines sentence would most appropriately "reflect the seriousness of the offense" while meeting the requirements "to provide just punishment" and "afford adequate deterrence." *Id.* § 3553(a)(2).

### a.  Mr. Cho's Personal Circumstances and Characteristics

Mr. Cho's personal history and character support a sentence of 30 months.  Mr. Cho has no criminal history.  Equally as important, and as reflected in the many letters of support from members of his immediate family and Mr. Cho's personal history recounted above, Mr. Cho is a family man—a devoted and engaged father to his daughters Yu.C. and Ye.C., and a loving husband to his wife Esther.

Since immigrating to this country nearly three decades ago, Mr. Cho has steadfastly worked to better himself, build a career in which his parents could finally take pride, and provide a comfortable and secure life for his family.  He has poured his heart and soul into supporting his daughters, both financially and emotionally.  Despite his recent life-changing missteps, as recounted in their letters, Bryan's wife and daughters remain steadfastly loyal and have never doubted that they could rely on his love, support, and full dedication.

His youngest daughter, Ye.C., refers to her dad as her superhero, who "makes sure we are happy," "gives the most amazing advice," and always makes time for her. Exhibit A at 9-10. His 14-year-old daughter Yu.C. describes her father as protective, loving, and selfless, writing: "His love for me and my family has always driven us to be the best [people] we can be. From him, I learned how to take action and fight for myself and others." *Id.* at 14. Esther points out that Bryan is a role model for both of their children, who "know that their father started with nothing, relied on no one, and yet was able to build a stable and successful career through many years of hard work." *Id.* at 6.

All three describe the devastation that his nine-month absence has imposed on their lives. Yu.C. shared that "it truly feels like a major part of our family's love was ripped as he was the supplier for our joy." *Id.* at 14. Similarly, Ye.C. wrote that "our family is incomplete without him." *Id.* at 10. Esther, who relied on Bryan to handle the outward-facing aspects of their family's responsibilities because of her limited English language skills, wrote that she has struggled to manage family finances and school interactions since Bryan has been in jail, and lamented that her daughters' "worlds were turned upside down" when their father was arrested in January. *Id.* at 7. Because both Esther's and Bryan's families live in South Korea, their support network in the United States is limited, and Esther and her daughters have had to weather the storm of Bryan's incarceration largely on their own. While Bryan and his family understand and accept that there must be consequences for his actions—including him serving time in prison—there can be no doubt that his continued absence will only wreak further havoc on the lives of his young children.

Moreover, and notwithstanding Mr. Cho's missteps, he has had a long and productive career as a public servant and was repeatedly commended with positive performance reviews and a reputation among his colleagues as a dogged investigator and peer always willing to help other agents. That reputation is confirmed by the letters from his former colleagues, which attest to Mr. Cho's generosity in both his personal life and in his work as an IRS agent. One of Mr. Cho's former colleagues noted his willingness to "offer assistance to others" and characterized him as a "reliable, trustworthy and decent person." *Id.* at 18. Mr. Cho's former supervisor William Cheung—an Iraq War veteran and law enforcement officer with nearly three decades of experience—described, in detail, how much Mr. Cho has suffered to date from these charges and reported that the conduct Mr. Cho is charged with committing was "out of character." *Id.* at 2-3. As Mr. Cheung, the former Assistant Special Agent in Charge of IRS-CI's New York Field Office, noted in his letter, Mr. Cho's unique role furthered numerous U.S.-South Korea bilateral tax investigations, by coordinating IRS-CI delegation visits to South Korea and helping both countries track down tax cheats. *Id.*

Mr. Cho also has strong ties to his community, both as a Christian supporting missionary work in Papua New Guinea, and by speaking about tax-related topics to the Korean American community in the New York metropolitan area. The Court should consider Mr. Cho's service as an IRS agent, his ties to his community, and most importantly his family in determining a just and fitting sentence.

As he will explain to the Court at sentencing, Bryan profoundly regrets and accepts responsibility for his decisions that resulted in the crimes to which he has pleaded guilty. He knows that nothing can justify or excuse his actions. But there is much more to Bryan than those

actions. Considering Mr. Cho's personal circumstances, a 30-month sentence is sufficient but not greater than necessary to accomplish the goals of sentencing.

      b. Nature and Circumstances of the Offense

      A below-Guidelines sentence of 30 months would account for "the nature and circumstances of [Mr. Cho's] offense" and "reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(1), (a)(2)(A). As an initial matter, Mr. Cho has timely accepted responsibility for his conduct, expressed deep remorse, and taken action to rectify his mistakes to the best of his ability, including by entering an early guilty plea, making timely payment of the full forfeiture amount months before it was due, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

      Moreover, it is widely recognized that in many fraud cases, the Sentencing Guidelines drastically "overstate[] the seriousness of [the] offense." *United States v. Rivernider*, 828 F.3d 91, 111, 114 (2d Cir. 2016).[6] Courts in this Circuit have repeatedly noted that the Guidelines are "just mindlessly accelerated once you have numbers of any size added in the loss or gain table." *United States v. Faibish*, No. 12 Cr. 265 (ENV), ECF No. 271 at 23 (E.D.N.Y. Mar. 10, 2016) ("[A] whole host of judges . . . have said so publicly and scores of others . . . have . . . grumbled about it privately.") (as quoted by Robert J. Anello & Richard F. Albert, *Rise of ABA Task Force's 'Shadow Sentencing Guidelines,'* 25 N.Y.L.J. (Apr. 5, 2016)); *see also United States v. Caspersen*, No. 16 Cr. 414 (JSR), ECF No. 37 at 80 (S.D.N.Y. Nov 4, 2016) (noting many "problems with the guidelines," including "their irrationality"; "their draconian [and] far too punitive approach to all crimes," including "white collar crimes"; "their very real responsibility for . . . mass incarceration"; and "the fact that they regard sentencing as an exercise in bean counting, as opposed to one of the most difficult tasks that . . . judges have to undertake").

      Here, the Guidelines significantly overstate the seriousness of Mr. Cho's conduct for several reasons. In this case, the Guidelines range is driven largely by the loss amount for Mr. Cho's wire fraud offense. The wire fraud offense level under the U.S. Sentencing Guidelines is 18,

---

[6]     It bears noting that judges in the Second Circuit have at times turned to the so-called "Shadow Guidelines," issued by a task force (including several judges from this Circuit) of the Criminal Justice Section of the American Bar Association, as an alternative and more reasonable guide to sentencing in such cases. *See generally* Am. Bar Ass'n, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf ("Shadow Sentencing Guidelines"); *see also* Anello & Albert, above (collecting cases applying the "Shadow Guidelines").

     If Mr. Cho were sentenced pursuant to the so-called "Shadow Sentencing Guidelines" for economic crimes, he would be subject to a much lower offense level than the 18 calculated under the U.S. Sentencing Guidelines ("USSG"). Using the same base offense level of 7, Mr. Cho would be subject to a 6-level increase for a loss more than $100,000 but less than $1,000,000 (compared to a 12-level increase under the U.S. Sentencing Guidelines). Mr. Cho should receive neither an increase nor a decrease for culpability. Because of the lack of "victim impact" (as described below, the money Mr. Cho was paid by the IRS cannot fairly be counted as loss to the government), there is no increase for that factor. With the 2-level increase pursuant to USSG § 3B1.1 because of Mr. Cho's abuse of a position of public trust, and the 3-level decrease for acceptance of responsibility, Mr. Cho would be subject to an offense level of 12 (compared to 18), suggesting a Guidelines range of 10-16 months on top of his 24-month mandatory minimum sentence for his conviction for aggravated identity theft.

which includes a 12-level enhancement for the amount of loss, calculated as Mr. Cho's entire salary and benefits from the time of Mr. Cho's background investigation in May 2019 until his arrest in this case in January 2021. PSR ¶ 12 & Addendum ¶ 12. But this loss amount and resulting Guidelines range substantially overstate the true harm caused for at least three reasons, all of which the Court should consider when evaluating the nature and circumstances of the offense under Sections 3553(a)(1) and (a)(2)(A).

*First*, the total loss amount in the Guidelines calculation does not account in any way for the fact that Mr. Cho continued to do his job at the IRS—and do it effectively—after the background investigation in May 2019. Instead, and as noted in the PSR, the stipulated loss amount of $394,374.63 treats Mr. Cho's *entire salary and all benefits he received* (less unpaid annual leave) from May 2019 until his arrest in this case as loss to the government.[7]

Mr. Cho stipulated to this loss amount in connection with his plea agreement, paid the full stipulated amount immediately after pleading guilty, and is not arguing that the Guidelines were miscalculated. That said, we respectfully submit that the Court should consider under 18 U.S.C. 3553(a) that the loss amount does not account for any offset for services rendered by Mr. Cho; pursuant to Guidelines § 2B1.1 Comment 3(e)(i), loss can be reduced by the "fair market value of . . . the services rendered, by the defendant . . . to the victim before the offense was detected."

There is no question that Mr. Cho provided valuable services to the IRS as a Special Agent between May 2019 and August 2020, when search warrants were executed and Mr. Cho was placed on leave. During this 16-month period, Mr. Cho continued to go to work every day and contribute to existing and new IRS investigations. Reflecting the effectiveness of his work and the value of the services he rendered, Mr. Cho's supervisors provided favorable reviews of his performance during this very period. *See* Exhibit C (annual evaluation for Mr. Cho for period October 2019 through September 2020, noting that he met or exceeded all performance expectations). We have not been alerted to, and are not aware of, any specific costs that the government attributes to Mr. Cho's misrepresentation on his SF85P.

While it is challenging to calculate the exact value of the services Mr. Cho rendered to the IRS between May 2019 and August 2020 (which is why that value is not deducted from the loss amount in the PSR), it is inconceivable that the value is $0. To the contrary, a reasonable estimate of the value of Mr. Cho's work would offset the loss by at least two-thirds, given the lack of any specific costs associated with his continued employment and the performance reviews demonstrating that he continued to work effectively during this time. Such an offset would have reduced the overall loss amount by almost $200,000, which would have placed Mr. Cho in a significantly lower offense level.

---

[7]     Specifically, and as noted in the PSR, Mr. Cho's SF85P form was reviewed as part of a periodic background investigation conducted from May 9 to 21, 2019. From the beginning of Mr. Cho's next pay period on May 12, 2019 through the date that the IRS placed him on unpaid leave after his arrest on February 12, 2021, Mr. Cho earned an estimated $412,627.43 in salary and benefits from the IRS. As of May 12, 2019, Mr. Cho was entitled to $18,252.80 of unpaid annual leave, bringing the net compensation that he was paid for the relevant period to $394,374.63. That figure represents the loss estimate in Mr. Cho's plea agreement with the Government and in the PSR. The forfeiture payment Mr. Cho made within days of his guilty plea also reflects that sum.

*Second*, the loss associated with the fraud is also overstated because it includes pay Bryan received while he was on leave from the IRS between August 2020 (when the government executed search warrants on his home and car) and February 2021 (when he was moved to unpaid leave). It was the IRS that chose to place Mr. Cho on paid leave, though the agency had sufficient information to place him on unpaid leave or move to terminate his employment (as demonstrated by the judicial finding of probable cause in the search warrants the government obtained). In circumstances such as these, it would be inequitable for the IRS to essentially leave the meter running, driving up loss during a period of paid leave that it chose to provide.[8] By incorporating this loss into the Guidelines calculation, the resulting range again overstates the true harm caused, this time by over $115,000.[9]

*Third*, Mr. Cho's wire fraud is a crime without an individual victim.[10] The only party adversely affected by Mr. Cho's misrepresentations in his SF85P and continued employment with the IRS is the IRS itself. But Mr. Cho has already repaid all the income he received from the IRS starting in May 2019. Moreover, and as noted above, Mr. Cho continued to work for the IRS and provide it with valuable services throughout the period impacted by the wire fraud offense, without credit under the Guidelines.

Nor was the individual identified in the Indictment as John Doe actually impacted by Mr. Cho's crimes. Mr. Cho possessed a passport and identification documents in John Doe's name that included Mr. Cho's picture, but he never used those documents in a manner that harmed John Doe. The fact that there is no direct victim of Mr. Cho's crimes is reflective of his motivation, which while severely misguided, was not driven by a desire to harm anyone.[11]

---

[8] Of course, Mr. Cho is not entitled to keep the money he received during paid leave—and indeed, he has already paid it back in the form of the completed forfeiture payment.

[9] Were these two reductions to loss sufficiently calculable to be included in the Guidelines, the result would be a substantially lower range. Excluding the pay to Mr. Cho after August 2020 and incorporating a two-thirds credit for the work he performed between May 2019 and August 2020 would reduce the loss amount to a total of approximately $79,000. That loss amount would trigger a six-point decrease in the Guidelines level and a range for Mr. Cho's wire fraud conviction of 10 to 16 months (rather than 27 to 33 months).

[10] The Shadow Sentencing Guidelines discussed above in note 4 consider victim impact and conclude that a lower sentence should result where there is "minimal or no[]" victim impact. Shadow Sentencing Guidelines at 5. The Shadow Guidelines consider four factors in evaluating victim impact: (1) the vulnerability of victims, (2) the significance of loss, (3) other non-economic harm, and (4) victim inducement of offense. *Id.* at 5-6. These factors support a finding of minimal victim impact here. The U.S. government is not a vulnerable victim, and the money paid to Mr. Cho was not a significant amount to the government. The government has not suffered any non-economic harm. While, of course, the IRS did not induce the offense, its actions in placing Mr. Cho on paid leave did contribute to the size of the loss. As discussed above, the government continued to pay Mr. Cho after a court found probable cause of criminal activity.

[11] Nor does the conduct alleged in the counts as to which Mr. Cho was not convicted involve any pecuniary harm to any purported victim. Notably, the PSR states that there are no known factors that would warrant a sentence outside the Guidelines range. PSR ¶ 95. But it suggests that the conduct alleged in Counts Eight and Nine of the Indictment—that is, alleged fraud in connection with the application submitted in connection with the purchase of Mr. Cho's family's co-op apartment—could form the basis for an upward departure because the conduct could not be factored into the Guidelines calculation. *Id.* ¶ 94. However, as noted in Mr. Cho's objections to the PSR, because fair market value was paid for the shares in the cooperative, there is no evidence that the cooperative or any other party

To be clear, Mr. Cho does not quibble with the technical accuracy of the Guidelines calculation or seek to change the stipulated amount of the Forfeiture Money Judgment, which he has already paid in full.  But the Court should consider that these factors—the credit for Mr. Cho's service, the unnecessary loss-mounting after August 2020, and the lack of an impacted victim— were not taken into account and should be reflected in a below-Guidelines sentence.

In sum, Mr. Cho is facing a 51 to 57-month Guidelines sentence for possessing a fraudulently obtained foreign passport in someone else's name and failing to disclose the same to the IRS, and then continuing to work for the IRS for almost two years.  We respectfully submit that a sentence within that range would be excessive.  Mr. Cho did not harm the man identified in the Indictment as "John Doe" and Mr. Cho did not actually steal almost $400,000 from the government when he did his job (effectively, according to performance reviews) and was paid for it.  That said, Mr. Cho understands that there should be some penalty for the wire fraud conduct above and beyond the 24-month mandatory sentence for the identity theft; we submit under these circumstances that an additional six months' imprisonment would be proportional, equitable, and no greater than necessary.

> c. Mr. Cho's Highly Punitive Detention at the MDC Makes a Sentence of 30 Months' Imprisonment Just Punishment

In light of the circumstances of Mr. Cho's detention since his arrest in January, a sentence of 30 months' incarceration will provide just punishment for Mr. Cho's offenses.  18 U.S.C. § 3553(a)(2)(A).  The circumstances of Mr. Cho's detention since his arrest have been severely punitive and render a sentence in the Guidelines range excessive.

As detailed above, Mr. Cho's almost nine months of detention at the MDC during the Covid-19 pandemic have been extremely challenging for him, far more difficult and punitive than pre-trial detention would be for a different defendant at a different time.  Mr. Cho's mental and physical health have deteriorated amid an unpredictable series of lockdowns that have left him repeatedly confined to his cell for up to 23 hours a day.  Bryan has been the target of hateful attacks—both verbal and physical—because of his race and his status as a former law enforcement officer.  His detention at the MDC since January has also significantly impaired his ability to work with his attorneys to prepare a defense to the charges against him, review discovery, negotiate a plea, and prepare for sentencing.  During Mr. Cho's repeated and sometimes weeks-long periods of quarantine, his attorneys have not been able to visit him at all and calls have been challenging to schedule.  Mr. Cho was not able to attend either of his two bail arguments because of restrictions on his out-of-cell time at the MDC.  While some of the problems at the MDC have subsided over the last year, new problems have been introduced by the severe staff shortage at the MDC in recent weeks and the recent influx of inmates from the shuttering MCC.  Inmates at the MDC have been

---

suffered any loss.  PSR Addendum ¶ 11.  Indeed, the government concedes in its response to Mr. Cho's objections that it was "not aware of any pecuniary loss suffered by the cooperative board."  *Id.*  Thus, even if Mr. Cho were to have been convicted of the co-op related wire fraud charges, the loss amount would be zero, and the Guidelines calculation would not increase.

increasingly restricted in their out-of-cell time, and it has been harder for inmates, including Mr. Cho, to get medical attention.

Bryan's almost nine months of physically punishing and emotionally challenging detention at the MDC should reduce his additional sentence by much more than the nine months he has served. Judges have recognized that detention at the MDC during the pandemic has been particularly arduous, sentencing defendants below Guidelines ranges in a number of cases. As one example, Judge Oetken noted that a defendant had a "really harsh" detention at the MDC, and remarked that the detention up to the date of sentencing was "probably twice as punitive as it would otherwise be." *United States v. Ramirez*, No. 20 Cr. 29 (JPO), ECF No. 47 at 19 (S.D.N.Y. Oct. 20, 2020). Judge Oetken concluded that if the just punishment for the defendant would have been "four years, I would probably sentence him to two years instead, given how harsh and punitive it's been," particularly for the defendant in Judge Oetken's case, who (like Mr. Cho) was convicted of a "nonviolent offense" and where there was "no concern about him being a danger to the community." *Id.*

Judges in the Eastern District of New York have similarly varied downward and imposed below-Guidelines sentences, on the basis of detention conditions at the MDC. *See United States v. Ricks*, No. 20 Cr. 330 (KAM), ECF No. 24 (E.D.N.Y. Aug. 27, 2021) (sentencing with 37-month downward variance in gun trafficking case due to harsh conditions at the MDC during the pandemic, among other factors); *United States v. Olivier*, No. 19 Cr. 229 (PKC), ECF No. 82 (E.D.N.Y. June 24, 2021) (sentencing 38 months below guidelines range in part due to conditions in Bureau of Prisons system); *United States v. Sepulveda*, No. 19 Cr. 229 (PKC), ECF No. 81 (E.D.N.Y. June 24, 2021) (finding that downward variance of 35 months was justified by harsh conditions at the MDC); *United States v. Battle*, No. 20 Cr. 349 (EK), ECF No. 31 (E.D.N.Y. Apr. 22, 2021) (sentencing below guidelines range and noting that defendant's conditions of detention at the MDC "are harsher than usual, given the ongoing pandemic" and that conditions at the MDC were "tantamount to unearned disciplinary segregation or worse"); *United States v. Carpenter*, No. 18 Cr. 362 (GRB), ECF No. 169 (E.D.N.Y. Mar. 29, 2021) ("[T]he guidelines . . . cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration. . . . [T]he time this defendant's already spent has been more punitive than it otherwise would have been. So I am going to reduce the entire range by 24 months."); *United States v. Hendryx*, No. 18 Cr. 478 (ENV), ECF No. 40 at 23 (E.D.N.Y. May 20, 2020) (varying downwards by 12 months in part because of the "special horrors" that Covid-19 "visited on congregate facilities . . . like the MDC"); *see also United States v. Morgan*, 19 Cr. 209 (RMB), ECF No. 90 at 12-15, 37 (S.D.N.Y. May 5, 2020) (issuing sentence less than half bottom end of Guidelines range based in part on conditions at the MDC).

Judges have applied the same principle in varying downward due to conditions at the MCC. *See United States v. Days*, 19 Cr. 619 (CM), ECF No. 35 at 19 (S.D.N.Y. Apr. 29, 2021) (describing MCC as having conditions as "disgusting, inhuman as anything I've heard about in any Colombian prison"); *United States v. Nettles*, No. 20 Cr. 509 (KPF), ECF No. 33 at 36 (S.D.N.Y. Mar. 12, 2021) (granting "substantial[]" downward variance of over 40 months below bottom of Guidelines range in bank robbery case in part "because of the conditions of your confinement" at MCC); *United States v. Cirino*, 19 Cr. 323 (JSR) (S.D.N.Y. July 21, 2020) ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder

time every day you are in the federal prisons."); *United States v. Aracena De Jesus*, No. 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) ("Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December.").

Notably, many of the judges in these cases imposed below-Guidelines sentences based on hardships relating to *general* conditions of detention at the MDC and MCC during Covid-19. In this case, by contrast, Mr. Cho suffered further at the MDC due to his exacerbating health conditions and his status as an Asian-American former law enforcement officer.

In sum, Mr. Cho's sentence should be reduced significantly due to his experience in custody during the almost nine months he has served in the MDC. The hardships he has experienced there justify a substantial reduction in the time he has left to serve. A failure to properly account for the time Bryan has spent at the MDC would result in an unjust and unnecessarily punitive sentence.

> d. Need for Punishment to Afford Adequate Deterrence and Protect the Public

Finally, a sentence of 30 months' imprisonment will afford adequate deterrence and protect the public from any further crimes. 18 U.S.C. § 3553(a)(2)(B–C). As an initial matter, Mr. Cho's complete lack of any past criminal history makes the likelihood of his recidivating low. *See* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 5 (Mar. 2016) ("A federal offender's criminal history [is] closely correlated with recidivism rate . . . . Each additional criminal history point [is] generally associated with a greater likelihood of recidivism."); *United States v. Cosimi*, 368 F. Supp. 2d 345, 349 (S.D.N.Y. 2005) (noting that defendant's "lack of criminal history," among other things, "indicate[d] that he presents a low danger of recidivism"); *see also United States v. Smith*, 321 F. Supp. 3d 405, 409 (E.D.N.Y. 2018).

Moreover, Mr. Cho's genuine remorse for his conduct further evidences the unlikelihood of recidivism and validates the appropriateness of a substantially below-Guidelines sentence. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 315 (S.D.N.Y. 2020) (granting sentence reduction based in part on "substantial evidence of [prisoner's] remorse in the letters from those who know him best"); *United States v. Jones*, No. 10 Cr. 905, ECF No. 2351 at 4, 2020 WL 6131252, at *2 (S.D.N.Y. Oct. 19, 2020) (noting importance "at the time of sentencing" of "genuine remorse" and "efforts at self-rehabilitation"); *United States v. James*, No. 08 Cr. 681 (JBW), ECF No. 131 at 5, 2011 WL 1671022, at *3 (E.D.N.Y. May 3, 2011) (defendant's "remorse for his crimes," among other factors, made it less likely that he would recidivate). Mr. Cho's actions since his arrest exemplify his commitment to making amends for his conduct and being a law-abiding citizen upon his release. Mr. Cho pleaded guilty in timely fashion. He paid the full forfeiture amount within days of pleading guilty. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

In addition, in working to remedy his past mistakes, Mr. Cho has the support of a network of friends and family, including his wife and daughters, former colleagues at the IRS, and members of his religious community. *See* Exhibit A. Their ongoing support for Mr. Cho even after his

arrest "speak[s] to his character and, importantly . . . a very decreased likelihood of recidivism going forward." *United States v. Pena*, 459 F. Supp. 3d 544, 547 (S.D.N.Y. 2020) (conclusion of sentencing court that defendant's "substantial ties to his family," among other things, demonstrated decreased likelihood of future recidivism); *United States v. Jones*, No. 13 Cr. 654 (RWS), ECF No. 11 at 12, 2015 WL 3484466, at *5 (S.D.N.Y. June 2, 2015) (letters of support from friends and family evidenced that defendant had "a life and a community to return to, and a good chance at not recidivating").

Mr. Cho has already lost the career he spent his life working to achieve. He has let down his family, once again disappointed his parents, and devastated his wife and his daughters. He has learned a profound lesson and will be a law-abiding citizen upon his release. The combination of a 30-month prison sentence and the career, health, and personal consequences Bryan has experienced as a result of making a misrepresentation on his SF85P and possessing a false foreign passport are surely adequate deterrence, both specifically as to Mr. Cho and more generally as to other potential offenders.

\* \* \*

We respectfully ask the Court to impose a sentence that is no harsher than a 30-month term of imprisonment. Mr. Cho has already been severely punished for his crimes by his detention at the MDC during Covid-19. A sentence longer than 30 months is not necessary to adequately reflect the seriousness of his offenses because the Guidelines range significantly inflates the true costs of Mr. Cho's crimes. Finally, Mr. Cho is devoted to his family and his community and is not a risk for recidivism. A sentence of 30 months' incarceration would be a fair and equitable sentence that is "sufficient, but not greater than necessary" to comply with the purposes of federal sentencing.

Sincerely,

Marshall L. Miller
Shawn G. Crowley
Andrew Chelsey

Attachments

cc: AUSA Elizabeth Geddes (via ECF)
AUSA F. Turner Buford (via ECF)
U.S. Probation Officer Patricia Sullivan (by email)