

U.S. Department of Justice

United States Attorney
Eastern District of New York

271 Cadman Plaza East
Brooklyn, New York 11201

EAG
F. #2018R02344

October 7, 2021

**<u>Submitted Under Seal</u>**

<u>By ECF</u>

The Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Bryan Cho</u>
            <u>Criminal Docket No. 21-40 (AMD)</u>

Dear Judge Donnelly:

      The government respectfully submits this letter in connection with the sentencing of defendant Bryan Cho, who prior to his arrest served as a Special Agent with the Internal Revenue Services, Criminal Investigations. Cho is scheduled to be sentenced on October 12, 2021. In his sentencing memorandum, Cho seeks a sentence of 30 months' imprisonment, below the low-end of the Guidelines range set forth in the plea agreement between the government and the defendant and in the Pre-Sentence Investigation Report ("PSR"). In light of the seriousness of the offenses to which the defendant pleaded guilty, the defendant's total abdication of his role as a federal law enforcement agent and the other factors set forth in 18 U.S.C. § 3553(a), the government respectfully submits that a sentence at the high end of the Guidelines range is warranted.

BACKGROUND

I.    <u>Overview of Offense Conduct</u>

      The defendant was arrested on January 26, 2021, in connection with a ten-count indictment and has been detained since then. On June 4, 2021, Cho pleaded guilty to aggravated identity theft related to his possession of a fraudulent foreign passport in the name of ▮▮▮▮▮ (Count Two) and wire fraud based on his failure to disclose his use of

███████'s identity and other misstatements in his background investigation in connection with his employment as a federal law enforcement agent with the IRS (Count Seven). The conduct underlying Counts Two and Seven is described below.

In or about September 2013, 



The IRS thereafter brought the matter to the United States Attorney's Office for the Eastern District of New York (the "Office") and, on or about October 3, 2013, the IRS – and specifically Cho – was formally "invited" to participate in an investigation of ███████ by the Office.

Another agent with the IRS ("Agent #2") has advised that in or about 2013, as part of the ███████ investigation, ███ was stopped at a New York airport, that ███'s identification and credit cards in his possession were inspected and copied, and that the following day, Cho interviewed ███ at an IRS office in Manhattan. Although Agent #2 was present for the interview of ███, the interview was conducted in Korean (which language Agent #2 did not speak) and there are apparently no memorandums or reports documenting the stop at the airport or interview of ███. In or about 2016, the investigation was formally closed without any charges. However, on February 10, 2017, Cho sent an email to an IRS employee, requesting that the employee obtain a copy of the birth certificate for an individual Cho identified as "███████, also known as ███████" with a date of birth of "███████" (███'s birthday is actually ███████) and born in ███████.

In August 2020, agents with the Federal Bureau of Investigation ("FBI") and the Treasury Inspector General for Tax Administration ("TIGTA") executed a search warrant at the defendant's residence in Manhattan, where they found an iPhone linked to an iCloud account in ███'s name, i.e., ███68@icloud.com, and containing photographs of a variety of apparently authentic United States-based identification documents for ███ (who was born in ███████ on ███████) and apparently fraudulent foreign identification documents, many of which included the defendant's photograph and were in the name of "███████" or "███████" with a date of birth of ███████ (one day after ███'s date of birth).[1] The iPhone included photographs of the following seemingly authentic

---

[1] Also on the iPhone were records related to other targets investigated by the defendant. The government does not believe the defendant had any law-enforcement reason to possess those records and the government is continuing to investigate his possession of those records.

identification documents from the United States:

- o A birth certificate from the ▮▮▮▮▮, documenting the birth of "▮▮▮▮▮" at ▮▮▮▮▮ on ▮▮▮▮▮, to the parents "▮▮▮▮▮," who was born in Korea and whose occupation was "▮▮▮▮▮," and "▮▮▮▮▮," who was born in Korea. The birth certificate also includes that the "[n]ame of the child should be: ▮▮▮▮▮."

- o An application for a United States Passport in the name of "▮▮▮▮▮" with a date of birth of ▮▮▮▮▮, and a place of birth as ▮▮▮▮▮. The date on the passport application was June 7, 2004.

- o A document titled "Passport Details (ACRQ)" for "▮▮▮▮▮" with a date of birth of ▮▮▮▮▮, and a place of birth as ▮▮▮▮▮. The document further indicates that the passport was issued on June 25, 2004, and expired on June 24, 2014.

The photographs of fraudulent identification documents included documents from the Republic of Guinea Bissau in the name of "▮▮▮▮▮," from the Republic of the Marshall Islands in the name of "▮▮▮▮▮" and from the Philippines in the name of "▮▮▮▮▮," including the following:

- Republic of Marshall Islands Identification Documents

  - o A purported letter from the Passport & Citizenship Office for the Republic of the Marshall Islands, Office of the Attorney General, certifying that a passport number ▮▮▮▮▮, which had been issued to ▮▮▮▮▮, was replaced by passport number C▮▮▮▮▮ and that the passport would remain valid from its issuance on March 14, 2014 to March 14, 2019. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit A.

  - o A purported passport from the Republic of the Marshall Islands with passport number C▮▮▮▮▮ in the name of "▮▮▮▮▮" with a date of birth of ▮▮▮▮▮. The passport includes an issuance date of March 14, 2014, and an expiration date of March 14, 2019. The photograph on the passport is obstructed by someone's finger. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit B.

  - o A purported "Republic of Marshal Islands Identification Card" in the name of "▮▮▮▮▮" with a date of birth of ▮▮▮▮▮, and an address of "▮▮▮▮▮ MAJURO, MH 96960." An ID No. of PP# C▮▮▮▮▮ is also included on the document. The expiration date is listed as March 14, 2018. A photograph of Cho is included on the identification card. A copy

3

of the photograph recovered from the defendant's iPhone is enclosed as Exhibit C.

- o A purported application for an "RMI" passport – believed to be the Republic of the Marshall Islands – in the name "▓▓▓▓" with a date of birth of ▓▓▓▓, place of birth as Philippines, a home telephone number of +65 ▓▓▓▓ and a mailing address at "▓▓▓▓" in Singapore. ▓▓▓▓'s parents were listed as ▓▓▓▓ (a citizen of ▓▓) and ▓▓▓▓ (a citizen of ▓▓). The application was dated September 11, 2019. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit D.

- Republic of Guinea-Bissau Identification Documents

    - o A letter of attestation showing that "▓▓▓▓" with a date of birth of ▓▓▓▓ was a citizen of the Republic of Guinea-Bissau. The letter included the date March 9, 2011, suggesting that it was issued on or about that date. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit E.

    - o A photograph of a passport from the Republica da Guinea-Bissau for ▓▓▓▓, whose date of birth was ▓▓▓▓. The issuance date of the passport was March 21, 2014, and it expired on March 21, 2019. The main photograph on the passport is covered by a piece of paper, but a smaller photograph of Cho appears to be on the passport.[2] A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit F.

- Philippines Identification Documents

    - o An identification card purportedly from the Republic of the Philippines Department of Finance Bureau of Internal Revenue in the name of "▓▓▓▓" with a date of birth of ▓▓▓▓, and an issue date of August 20, 2012. Notably, the signature line is blank. A photograph of Cho appears to be appended to the identification card. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit G.

    - o A purported document identifying "▓▓▓▓" as a "Professional" for the "Republic of the Philippines, Department of Transportation &

---

[2] GPS data shows that the photograph was taking at ▓▓▓▓ in Manhattan [Cho's then-residence] on September 24, 2018, at 10:17 a.m.

4

Communication Land Transportation Office East Ave Quezon City." ███████████'s date of birth is listed as ███████. The identification card expired on June 23, 2017. A photograph of Cho is included on the identification card. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit H.

- An identification card from the Republic of the Philippines Social Security System ("SSS") for "████████████" with the date – which in context appears to be a purported date of birth – of ████████. A photograph of Cho is included on the identification card. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit I.

- A photograph of a passport from the Republic of the Philippines for ███████████, whose date of birth was ████████. The issuance date of the passport was September 11, 2013, and it expired on September 10, 2018. The photograph on the passport is covered by another object. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit J.

- A purported affidavit of acknowledgment/admission of paternity by ███████████ and ███████████ seeking delayed registration of the birth of "██████" born on ████████ at "Meycauayan, Bulacan." The document was purportedly sworn on August 12, 2014, in Bulacan, Philippines. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit K.

- A purported birth certificate from the Republic of the Philippines for "███████████" with a date of birth of ████████, at Meycauayan, Bulacan. The birth certificate was issued on August 29, 2014. A copy of the photograph recovered from the defendant's iPhone is enclosed as Exhibit L.

Records obtained from the Republic of the Marshall Islands show that a passport was in fact issued in the name of "████████" with a date of birth of ████████, and the defendant's photograph on or about March 14, 2014. Records from HSBC bank in Hong Kong show that in or about the Summer of 2014, a bank account was renamed NC Solutions Corporation Limited ("NCSolutions #1") and the authorized person for that account was listed as "██████." A search of an email account used by Cho's partner, John ██ (who bears no known familial relation to ██████), show that John ██ had black and white copies of the Republic of the Marshall Islands passport and ID card (both in the name of "██████" and with the defendant's photo) and used those documents to try to justify the continued existence of the HSBC account NCSolutions #1 in 2015.

Records from the Philippines show that a passport and SSS identification card in the name of "███████████," with a date of birth of ████████, and with the

5

defendant's photograph, were used to open two bank accounts in the Philippines in the Fall of 2014.

Also on the iPhone 8 was a photograph of email correspondence between Cho, using his IRS email address, and another IRS employee, using her IRS email address, on May 2, 2018, in which Cho asked, "Can you check if there any hit on ▇▇▇ DOB: ▇▇ Passport #: ▇▇?" Cho then claimed, "I am just doing annual check. Is there any way you can flag him on the system whenever he attempts to renounce the citizenship." The IRS employee answered, "I just went through all the ▇ names and still no ▇▇▇." Significantly, this email was apparently sent well after the investigation into ▇ was closed.

Also recovered on the iPhone 8 were images of documents showing that another entity, NCSolutions Pte, Ltd., ("NCSolutions #2"), was also linked to "▇▇▇." Specifically, there was an email, dated March 9, 2018, from an individual at Aegis Partners to ▇@my.com, confirming the incorporation of NCSolutions #2, and noting that it would be sharing documents in an online folder via ▇@my.com. Also found on the iPhone 8 was the Constitution of NCSolutions #2, which indicated that it had been incorporated on March 9, 2018, and reflecting that one share of the entity had been issued to "▇▇▇" with a Marshall Islands Passport No. C▇▇. Copies of the photographs of these items, recovered from the defendant's iPhone, are enclosed as Exhibit M. In sum, it appears that Cho used one of the fake passports he created to incorporate NCSolutions #2 in Singapore.

Several email accounts in the name "▇▇▇" were created by the defendant and others. For example, Google records for ▇▇▇777@gmail.com show that the account was created on July 2, 2019, using IP address 2600:387:5:805:0:0:0:a4 by an individual who reported his/her date of birth as September 6, 1971. (AT&T did not retain records of who was using that particular IP address at the particular time that the account was created.) A review of emails obtained pursuant to a court order placed and received by the individual(s) using the email address ▇▇▇777@gmail.com shows that the individual(s) using the email address ▇▇▇777@gmail.com emailed with John ▇ and others. In an email between ▇▇▇777@gmail.com, John ▇ and an individual using email address "▇▇▇@gmg.asia," on July 3, 2019, John ▇ wrote, in part, "Donald, I am cc'ing my good friend ▇ to this email. He is interested in buying property in Manhattan and has a bunch of questions for you on how to proceed with GMG. He will be in Singapore in mid August so ideally can meet you but will probably have some questions for you ahead of time as well as you for him? … Best, John[.]" Based on the temporal proximity between the July 3, 2019 email and the defendant's subsequent purchase a Manhattan cooperative (described in further detail below), there is probable cause to believe that the mortgage purportedly sought by "▇▇▇" was in fact one sought by Cho.

II.  Additional Conduct

A preponderance of the evidence also shows that the defendant received bribes from officials in South Korea in or about and between 2010 and 2012.  While the government has not charged the defendant with any offenses involving bribery, the government commenced its investigation into the defendant after law enforcement in Korea advised the government that it had investigated and prosecuted several public officials for purportedly paying bribes to the defendant in exchange for providing information on an investigation relating to ███████████████████████████████████████ ███.  According to transcripts provided by law enforcement in Korea, two witnesses testified that they delivered money to Cho through his wife's mother and sister in Korea (Cho's mother-in-law and sister-in-law) in exchange for Cho's provision of information.  Cho's youngest sister-in-law Choi Dan-bi also testified, but denied having received any bribes.  One of the witnesses who implicated Cho was a South Korean official of the National Tax Service ("NTS") named Park Yoon-joon ("Park").[3]  Specifically, on March 1, 2018, Park provided the following information to law enforcement authorities in South Korea, in part and in substance.

   a. Park met the defendant, who he described as a Korean-American IRS official, when Park was serving as a resident official at the New York Consulate General.  Following their meeting, the defendant and Park maintained a relationship.

   b. Park asked the defendant to find out information related to the relationship between a U.S. "slush fund" and Kim Dae-jung, a former president of Korea.  The defendant initially refused but agreed to try after Park suggested that funds could be provided as a "special activity cost" of the NTS.  (Park did not

---

   [3] Park Yoon-joon testified on multiple occasions and excerpts of that testimony were provided to the United States and subsequently translated.  The information set forth herein is based on the translations conducted to date.  In certain parts of the transcriptions, Park Yoon-joon is identified as a "suspect" and it is not clear what, if any, benefits he has received or expects to receive in exchange for his testimony.  According to a translation of a judgment by the Seoul Central District Court (the "Seoul District Court") (provided to the government by counsel for Cho in December 2020), the Seoul District Court reversed a conviction of Lee Hyun-dong (who held a superior position to Park Yoon-joon at South Korea's National Tax Service) and was accused of crimes tangentially related to the bribery of Cho, including that he accepted his own bribe.  In its opinion, the Seoul District Court found certain statements supporting that Lee Hyun-dong had accepted a bribe, including statements by Park Yoon-joon, either "hard to believe" or "insufficient" to amount to the bribery charge against Lee.  Media reports show that an appellate court found Park Yoon-joon not guilty of the charges lodged against him because he did not participate in the internal decision-making process at National Intelligence Service ("NIS") and was simply funneling money to Cho at the direction of a superior at NTS.

7

      disclose that the funds to be paid to the defendant were in fact from South Korea's National Intelligence Service).

   c. In the spring of 2012, a few months before he was promoted to be Deputy Director of the NTS, Park met the defendant's sister-in-law, who he identified as Choi Dan-bi, and provided her money to be given to the defendant.[4] The amount of money was approximately 100 million won.[5]

On July 23, 2018, Park Yoon-joon testified as follows, in part and in substance:[6]

   a. Park met the defendant's sister-in-law on one occasion, either to receive information provided by the defendant or to provide money to the defendant's sister-in-law.

   b. Park was confronted with what appears to be a written document titled "Progress Status Report." Park stated that the information contained in the Progress Status Report was "generally" information he learned from the defendant and that he then had to relay that information to others. The Progress Status Report stated, in part, "According to [the defendant], the U.S. federal prosecutors indicted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the position of the manager for a slush fund for 'tax evasion and fraud charges' and ▮▮▮▮▮▮▮▮▮▮▮▮ admitted to all the charges through a plea bargain with the prosecution. The prosecution is proposing 'one year in prison, 3 years of supervisory release and a fine of 2.5 million dollars.'"[7]

---

    [4] Cho's sister-in-law testified that she met Park on only one occasion, in or about the Spring 2010, when she was nearing the completion of her university classes. According to Cho's sister-in-law, Cho arranged for her to meet Park, who she believed to be a high-level official at NTS.

    [5] Based on publicly available data, the U.S. dollar to South Korean won conversion rate on April 13, 2012, was 1 dollar to 1116.70 won. At that conversion rate, the 100,000,000 won payment was worth approximately $89,500.

    [6] The information set forth here is, as discussed earlier, based on translations of the transcript excerpts from Park's testimony that was provided by the South Korean government.

    [7] Based on a review of criminal history reports and IRS case records, it does not appear that ▮▮▮▮▮▮▮▮ was ever criminally charged in the United States. Nor does it appear than any of the individual described in this paragraph were investigated or prosecuted by U.S. authorities.

c. Park was confronted with what appears to be another written document titled "Progress Status Report." This Progress Status Report included the following statements:

   i. "Deputy Director PARK contacted several times [redacted] [the defendant], who was visiting for the purpose of caring for his father and encouraged him to publish the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to the Korean media in the U.S. as soon as possible and took measures to have [redacted] [the defendant] personally prepare an article to be published to the press."

   ii. "For this, . . . Deputy Director to Deputy Director PARK - requested to have [redacted] [the defendant] draft (over 10 pieces) very detailed articles for the press release and provide copies for an advance review upon completion of drafting the articles."

d. "Before off shore tax evasion or after, we had a lot of intelligence cooperation with the U.S. IRS and the person who played the role of a desk and a window was [the defendant] for individual cases. I have been doing that type of work from before. But, actually, we needed a lot of information on individual companies or these areas but he has not been cooperating at the time while it looked as if he was going to provide them. And then this work was initiated by the NIS and money was paid. We had a talk between [the defendant] and me that if he provides the investigation information for this, this amount would be paid. I reported that to the commissioner and probably the same went for the NIS. Although there was nothing stipulated between two of us, I had an expectation that the rest of the matters would go if we got tied together for this case since he did intelligence cooperation of all the other offshore tax evasion. It was not stipulated or done verbally and, actually, this case took 2 years. It was an investigation that took almost 2 years from May 2010 to the beginning of 2012. In real, the provision by him of the information on individual companies was much smoother than before. And that was what I expected secretly although I was not sure the commissioner also had such an expectation secretly, but this was not done in communion with the NIS. I had a lot of expectation actually thinking that that area might change slightly since we were like friends and got weaved together like this. Many of those things were achieved in reality. But this was not done in communion with the NIS."

e. "Back then [the defendant] made a request, and what the total amount was at the time . . . now that I think about it and now the prosecution is showing me all the documents from the investigation, I realize it was over 300 million Won. I made my own guess because I was quite puzzled 'why this went there?' and 'why did I do it?' and that is I probably was not interested at all why it was over 300 million Won back then. But frankly, I am not sure whether I gave it because [the defendant] asked for it or the NIS actively told

9

me to give it to him. I am a bit puzzled on why I got involved when I did at other times."

f. The defendant sent one "massive" document to Park.[8]

g. Park frequently spoke on the phone with the defendant.

On June 4, 2018, Choi Ho-sik provided the following information to law enforcement authorities in South Korea, in part and in substance.[9]

a. Choi Ho-sik was employed by the NIS beginning in 1991. He served as an aide to the Third Deputy Director of the NIS from October 2009 until May 2013. One of the Third Deputy Directors for whom Choi Ho-sik served as an aide was Choi Jong-heup.

b. In or about May 2010, upon receiving instructions from Choi Jong-heup, Choi Ho-sik concealed approximately 35 million won in a food product package and delivered it to a female, who Choi Ho-sik identified as Choi Dan-bi.[10] Upon receiving additional instructions, Choi Ho-sik delivered to Choi Dan-bi 35 million won on or about May 20, 2010; 35 million won on or about May 28, 2018, 15 million won on or about May 31, 2010, and 50 million won on or about June 14, 2010.[11]

---

[8] A review of the emails the defendant sent and received using his IRS account did not reveal any emails, "massive" or otherwise, in which the defendant transmitted sensitive information to Park.

[9] It is not clear what, if any, benefits Choi Ho-sik has received or expects to receive in exchange for his testimony. Similar to the testimony of Park, excerpts of Cho Ho-Sik's testimony and statements were provided by South Korea and subsequently translated. The information set forth herein is based on those translations.

[10] Based on publicly available data, the U.S. dollar to South Korean won conversion rate on May 7, 2010, was 1 dollar to 1151.00 won. At that conversion rate, the 35,000,000 won payment was worth approximately $30,400.

[11] Based on publicly available data: (i) the U.S. dollar to South Korean won conversion rate on May 20, 2010, was 1 dollar to 1194.41 won and the 35,000,000 payment was worth approximately $29,303; (ii) the U.S. dollar to South Korean won conversion rate on May 28, 2010, was 1 dollar to 1195.09 won and the 35,000,000 payment was worth approximately $29,286; (iii) the U.S. dollar to South Korean won conversion rate on May 31, 2010, was 1 dollar to 1202.16 won and the 15,000,000 payment was worth approximately $12,477; and (iv) the U.S. dollar to South Korean won conversion rate on June 14, 2010, was 1 dollar to 1221.38 won and 50,000,000 payment was worth approximately $40,937.

10

c. Choi Ho-sik later served as an aide to Kim Nam-soo. Upon the instructions of Kim Nam-soo, Choi Ho-sik delivered 115 million won to Choi Dan Bi on or about September 13, 2010.[12]

Other records obtained by the government corroborate, in part, the testimony of Park that Cho agreed to receive bribes in exchange for information as to ▇▇▇. (However, as described above, no evidence supports that ▇ was ever prosecuted, as Park advised that Cho had told him.) First, a review of emails and telephone records shows that Cho was in fact close with Park. Second, in or about May 2010, Cho in fact opened an investigation into ▇▇▇.[13] Third, eventually, Cho obtained a set of documents that could be consistent with the "massive document" referred to by Park. That is, on March 23, 2012, Cho emailed Agent #2, with an attachment titled "Investigation documents.zip", and forwarded an email from another IRS agent based in Albany, New York ("Agent #3") that said:

> Hi Bryan [i.e., the defendant], attached is a file with all the memos from the case [another agent] and I worked regarding ▇▇▇. I included the Disco report and some schedules prepared from financial analysis. The two owners of ▇▇▇ were ▇▇▇ and ▇▇▇. Please call me if you have any questions or need additional info.

Agent #3 had conducted an investigation of ▇▇▇, a business entity, and ultimately recommended closure of the investigation upon learning of the defendant's investigation of ▇▇▇ because ▇▇▇ appeared to control ▇▇▇. Attached to the email was a zip file containing information learned by Agent #3 during his investigation of ▇▇▇. Cho's investigation of ▇▇▇ was closed in or about July 2012 for a lack of evidence. Finally, Cho conducted searches of confidential law enforcement databases, including FinCEN and its predecessor, for records relating to his mother, his mother-in-law and his wife. Significantly, the searches for his mother-in-law began in the summer of 2012.

B.  The Defendant's Purchase of the Manhattan Cooperative

The defendant's fraudulent activities also extended to the purchase of a three-bedroom duplex in a cooperative on the Upper East Side in Manhattan for $1.65 million in cash. First, to fund the purchase, the defendant caused more than a million dollars to be funneled "care of" NC Solutions #2, the corporate entity described above that was registered

---

[12] Based on publicly available data, the U.S. dollar to South Korean won conversion rate on September 13, 2010, was 1 dollar to 1160.13 won and the 115,000,000 won payment was worth approximately $99,126.

[13] According to testimony provided pursuant to the MLAT Request, May 2010 is the month that a witness testified that he first gave bribe payments to Cho's sister-in-law.

11

in the name of "████" – to a bank account in Cho's spouse's name. The government's investigation into how the purchase was funded remains ongoing in large part because the purchase was funded with money housed in foreign banks in a string of suspicious transactions. To date, the government's investigation has revealed that the funds used to purchase the property were transferred in increments of approximately $380,000 (1) from a bank account in the name of Cho's mother-in-law, Young Ja Song, to a bank account in the name of Cho's sister-in-law, Choi Jee Su (who is not the sister-in-law who accepted the bribe payments), (2) to a bank account in the name of Cho's mother, Jae Eun Cho, and two bank accounts in the name of Cho's sister, Sun He Cho, and (3) to a bank account in the name of Cho's wife, Esther Cho.[14] A flow chart depicting these transfers is attached as Exhibit N. While the investigation remains ongoing, Cho's claims that the property was funded by his family members is highly suspect given the utter lack of transparency in light of the nature and quantity of the transactions.

Second, to obtain approval from the cooperative board, the defendant created fraudulent documentation that falsely stated that his salary was nearly double his actual salary, that his spouse was gainfully employed although she was not and that his family's bank accounts contained almost ten times the amount of funds they actually contained. Perhaps most egregious, in light of his role as a federal law enforcement agent with IRS-CI, the defendant materially altered bank statements and IRS Form 1040s to perpetuate these lies.

    C.    <u>The Defendant's Prior Ownership of a Condominium in Edgewater, New Jersey</u>

On or about May 25, 2007, Cho and his mother, Jae Eun Cho, also known as Jae Eun Choi, for whom Cho acted as an attorney-in-fact, purchased a condominium at One Hudson Park in Edgewater, New Jersey, for $699,800 and together secured a mortgage in the amount of $559,900. As part of the purchase, Cho and his mother were also responsible for paying fees to the homeowners' association. On April 18, 2011, Cho transferred his interest in the property by quitclaim deed to his mother, Jae Eun Cho, and Cho, again acting as his mother's attorney-in-fact, had the mortgage in the amount of $559,296 transferred to his mother's name. In July 2011, just after the mortgage and property were no longer in his name, Cho and his mother stopped paying the required homeowners' association fees. In August 2011, Cho and his mother then stopped paying the mortgage payments, but Cho continued to live in the condominium for several years. In or around 2012, Cho provided to the bank purported tax return filings for Jae Eun Cho and paystubs. On at least two occasions in 2014, while the condominium was pursuing Cho's mother for unpaid fees, Cho

---

[14] Earlier today, the government obtained additional bank records showing that the transfers by Young Ja Song (the defendant's mother-in-law) to her daughter Choi Jee Su (the defendant's sister-in-law) were funded by unknown deposits into Young Ja Song's bank account of $500,000 on June 26, 2019, $900,000 on July 12, 2019 and $100,000 on July 19, 2019.

used his IRS badge to intimidate a board member and the doorman at One Hudson Park. During one conversation with the board member, Cho advised that his unit was investigating One Hudson Park and another condominium across the street, in an apparent attempt to intimidate the board member. In or about 2015, Jae Eun Cho filed for bankruptcy. In context, a preponderance of evidence supports that the defendant defrauded both the homeowners' association and the bank funding the mortgage when he transferred the property to his mother and intentionally stopped paying the mortgage payments and homeowner fees.

## DISCUSSION

I. The Guidelines Calculation

The government agrees with the Guidelines calculation in the PSR, with one exception in light of the defendant's sentencing submission that included the following:

> While serving as an IRS-CI agent, Mr. Cho considered using an individual as a confidential source in international tax investigations. The individual told Mr. Cho that he had access to networks in Asia that could obtain passports from various countries under false identities, and that he could use that access as part of an investigation into tax evasion by cryptocurrency owners who were using fraudulently obtained foreign identification documents to evade U.S. taxes. To prove to Mr. Cho that he had the ability to obtain such passports, the individual fraudulently obtained a passport from the Republic of Guinea-Bissau and other identification documents (the "Documents") that contained photographs of Mr. Cho and the name of the individual identified as "John Doe" in the Indictment, and he gave the Documents to Mr. Cho.

The government respectfully submits that the defendant should not receive a three-level reduction for acceptance of responsibility should he continue to assert that his basis for possessing and using the fraudulent identification documents in the name of "▮▮▮▮▮▮▮" and with the defendant's photograph was in furtherance of a potential undercover operation with the IRS, misguided or otherwise.

A. Applicable Law

Section 3E1.1 of the Guidelines provides:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government

13

stating that the defendant has assisted authorities in the
investigation or prosecution of his own misconduct by timely
notifying authorities of his intention to enter a plea of guilty,
thereby permitting the government to avoid preparing for trial
and permitting the government and the court to allocate their
resources efficiently, decrease the offense level by 1 additional
level.

A court may withhold a reduction for acceptance of responsibility under Section 3E1.1 of the Guidelines "based on a credibility determination that the defendant has not accepted responsibility for the offense of conviction." United States v. Reyes, 9 F.3d 275, 280 (2d Cir. 1993) (citing United States v. Moskowitz, 883 F.2d 1142, 1154–55 (2d Cir. 1989) (Section 3E1.1 credit denied based on sentencing judge's skepticism regarding defendant's narrowly tailored acceptance of responsibility)).

Application note 1 provides a non-exhaustive list of factors for a court to consider in determining whether to award such a reduction. Among the relevant factors is whether a defendant has "truthfully admit[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." While "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a), . . . a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, app. n.1.

B. Analysis

As noted above, in his sentencing submission, the defendant asserted that he obtained the fraudulent identification documents in ▮▮▮▮▮▮'s name from an individual he considered using as a confidential source and suggests that the potential confidential source did so to prove that he could create these fraudulent identification documents and potentially assist in a cryptocurrency investigation. In fact, the "potential source" was John ▮▮, a close friend of the defendant. It is true that the defendant posited to his supervisor at the IRS that John ▮▮ serve as a confidential source in a cryptocurrency investigation, but that did not occur until in or about early 2020, well after the identification documents were created. Moreover, the defendant's assertions regarding his reasons for first obtaining the fraudulent identification documents strain credulity, both because they are absurd on their face and in light of the number of documents created and extent to which they were used. His assertions also wholly neglect that the name fraudulently used was not a random one, but rather a high-level executive at ▮▮▮▮▮▮ who the defendant was purportedly investigating and whose name and pedigree information the defendant had absolutely no basis to disclose to anyone outside of law enforcement. Finally, the defendant's explanation cannot explain why the photographs on the identification documents were sometimes obstructed, strongly suggesting

14

that they were in the midst of alteration and not at all supporting his claim that he merely received completed fraudulent documents from this potential confidential source.

Of course, the defendant had no obligation to explain his possession of the fraudulent identification documents, but he cannot provide a false explanation, particularly here where he attempts to minimize his culpability in possessing the documents. To be sure, the government has not yet identified the defendant's intent in obtaining the fraudulent documents,[15] but it is clear that it was not part of a good-faith sanctioned or even unsanctioned investigation carried out by the defendant. Rather, the defendant's use of ████ ████'s name was nefarious, extensive and spanned a period of years.

Furthermore, the defendant's word is utterly insufficient to show that the documents were obtained in good faith and without bad purpose. The defendant has a long history of fabrications and has shown a willingness to make untruthful statements to the Court and others with abandon. As one small example, earlier this year when the defendant sought bail, he suggested through counsel that he never sought to flee the United States but instead had just clicked on a pop-up advertisement for an entity providing citizenship or residence in a foreign country by investment. In fact, records from a UK-based company show that the defendant sought to obtain citizenship in the country of Vanuatu for himself and his family, made a payment of $20,000, supplied identification documents for himself, his wife and his two children and was on track to obtain citizenship for his entire family in as little as a month. See https://www.astons.com/citizenship-by-investment/vanuatu/ (advertising that citizenship for a family of four is available in as little as a month for an investment of $180,000). It remains unclear that defendant ever actually abandoned his plan to purchase citizenship by investment.[16] (A device seized from the defendant on January 26, 2021, shows that beginning around January 20, 2021, Cho installed and accessed applications for at least two private jet booking companies: "XO powered by JetSmarter" and "Fly Air.")

---

[15] The government was not afforded an opportunity to complete its investigation prior to seeking an indictment against the defendant because it learned that the defendant was taking steps to flee the country.

[16] In his sentencing submission, the defendant asserts that "[t]he payment apparently did not go through, and Mr. Cho abandoned the process shortly thereafter" and that "[w]hile representatives of the company continued to reach out to Mr. Cho into early January to encourage him to continue the process and re-attempt payment, Mr. Cho stopped responding to their entreaties on December 31, 2020." However, the only apparent support for these statements were emails from a representative from Astons in Russia who spoke with defense counsel (which emails were included as Exhibit F to the defendant's sentencing memorandum) and the records obtained by the government shows that that representative was not a reliable reporter of Cho's status with Astons.

15

II.     A Sentence at the High End of the Applicable Guidelines Range is Warranted

　　　　The government respectfully submits that, in this case, a sentence at the high end of the advisory Guidelines range is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

　　A.     Legal Standard

　　　　The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

　　B.     Analysis

　　　　Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence at the high end of the Guidelines range – and not a sentence of 30 months' imprisonment, as requested by the defendant – is appropriate in this case.

　　　　1.     The Nature and Circumstances of the Offense

　　　　The defendant has been convicted of very serious crimes, crimes which are particularly egregious given that he committed them while he had been entrusted to represent the United States of America, and that he was able to commit using information he obtained as a result of his position as a federal law enforcement agent. For example, over a course of years, the defendant obtained copies of legitimate identification documents of ▬ during a border stop at a New York airport, requested a copy of a U.S. birth certificate for ▬, and had searches conducted to see if and when ▬ had renounced his U.S. citizenship. The defendant's use of law enforcement resources for his own personal gain is also apparent by his conducting searches of sensitive law enforcement databases for information related to his

16

mother and mother-in-law, including not long after his mother-in-law was provided with bribe payments meant for the defendant. The lies perpetuated by the defendant in his background investigation are also very serious. By lying repeatedly, the defendant undermined his ability to ever testify in court or otherwise swear to information he learned as part of his role as a law enforcement agent and jeopardized any prior convictions in connection with investigations to which he contributed. In short, the defendant completely disregarded his sworn oath to discharge his duties as a federal law enforcement agent.

      The defendant argues that the Guidelines, and particularly the loss amount, overstate his culpability. The government disagrees. As noted above, the defendant's pattern of fraudulent conduct wholly undermined his ability to serve as a federal law enforcement agent, essentially negating the value of virtually all of his work. Indeed, the defendant's creation of false paperwork in support of his application to the cooperative board – including doctored bank account statements and IRS Forms 1040 - casts doubt as to the authenticity and reliability of records provided by the defendant to prosecutors and other law enforcement agents while the defendant served as a law enforcement agent. In addition, the loss amount accounts only for the defendant's earnings <u>after</u> the defendant lied during his background investigation and does not include his earnings prior to that time, despite that he was also then committing criminal conduct, and thereby negating the value of any work he did then too. Furthermore, the loss amount does not include the costs to the IRS in reviewing the any work conducted by the defendant and the costs incurred by the IRS for duplicate his efforts required for a new agent to get up to speed on his open investigations. Finally, the Guidelines calculation does not sufficiently account for the gross abuse of trust by the defendant while he served as a federal law enforcement agent.

      2.    <u>The Defendant's History and Characteristics</u>

      As discussed above, the defendant's history and characteristics, including (i) accepting bribes from public officials, (ii) defrauding the homeowners association and bank funding his mortgage in Edgewater, New Jersey, (iii) abusing his position as a federal law enforcement agent by flashing his badge and falsely claiming that he was pursuing an investigation of the One Hudson Park, (iv) obtaining fraudulent identification documents in three foreign countries, (v) lying during his background investigation and (vi) making false statements and providing false paperwork to the cooperative board, show that the defendant is committed to a life of fraud and the crimes to which he pleaded guilty were hardly aberrational. It also strongly supports that the likelihood for recidivism is not at all low, as the defendant asserts. Indeed, while the defendant does not have a prior criminal history, his period of fraudulent activity is lengthy and wide-ranging. In an intercepted telephone call with his wife, his wife perceptively described the defendant as follows:

> During all these years that I've been living with you, I knew you schemed and were a schemer. But, I turned a blind eye to your evil and conniving nature. I hoped God would change you and just lived with you . . . until now. I found out about it five years ago and I knew, I knew. But, I let it go. I let it go for the past

17

> 16 years, but because we came to this mess I can't turn a blind
> eye to you anymore if we were to continue to live together.

In sum, the defendant's history and characteristics also support a sentence at the high end of the Guidelines range. 18 U.S.C. § 3553(a)(1).

        3.        Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offenses – the use of a fraudulent identification and lies during his background investigation – are serious, particularly in the context that he had taken a sworn oath to uphold the law as a federal law enforcement agent. By engaging in criminal activity using information he obtained as a result of his position as a federal law enforcement agent, the defendant has demonstrated an utter lack of respect for the law.

        4.        Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

In this case, specific deterrence and incapacitation are critical. When the defendant became a federal law enforcement agent, he took an oath, swearing to uphold the law. He did just the opposite. Moreover, not only did he not honor his oath, but he exploited the trust and access afforded to him as a result of this oath. Nor is his likelihood of recidivism low, as he suggests in his sentencing memorandum.

A sentence at the high-end of the Guidelines range will, however, at least incapacitate the defendant, thereby protecting the public from further crimes he would otherwise commit during that period of time. Given the need for deterrence and incapacitation, the government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(C).

        5.        Avoiding Unwarranted Disparities

Finally, a sentence at the high end of the Guidelines range is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

IV.     A Fine Within the Guidelines Range Is Warranted

The government also asks the Court to impose a fine.  Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  The defendant bears the burden of proving an inability to pay.  United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998).  In this case, the defendant cannot sustain this burden.  The government respectfully submits that the sentence in this case should include a fine within the advisory Guideline range of $10,000 to $100,000.  U.S.S.G. § 5E1.2(c)(3).

CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence at the high end of the applicable Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Because this letter includes the full name and pedigree information of ▓▓▓ ▓▓▓, the government requests that it be filed under seal and that the government publicly file only a redacted version of this letter.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:     /s/
        Elizabeth Geddes
        F. Turner Buford
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of the Court (BMC) (by ECF)
        Patricia Sullivan (by e-mail)
        All Counsel (by ECF)